UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ROQUE JACINTO FERNANDEZ, acting
on behalf of minor children,
C.R.F.B. and R.J.F.B.,

       Petitioner,

v.                                  Case No. 8:16-cv-2444-T-33TGW

CHRISTY NICOLE BAILEY,

       Respondent.

_____/

**ORDER**

This cause comes before the Court on the merits of Petitioner Roque Jacinto Fernandez's Verified Petition for Return of Children to Panama (Doc. # 1), which was filed on August 24, 2016. Respondent Christy Nicole Bailey filed an amended Answer with affirmative defenses to the Petition on September 7, 2016. (Doc. # 15). The Court held an evidentiary hearing from September 12, 2016, to September 14, 2016. Both sides were represented by counsel and both gave sworn testimony at the hearing. The Court also spoke with the children *in camera* to determine the applicability of Respondent's affirmative defenses. After due consideration, the Court denies the Petition.

I.   **Factual Background**

In the pleadings and at the evidentiary hearing, both sides presented testimony and documentary evidence, which was often contested by the other party. However, much of the evidence

1

presented, especially the contested evidence, relates to the merits of the underlying custody determination rather than this Court's limited inquiry into whether the removal of the children by Respondent was wrongful under the Hague Convention, and, if so, whether one of the Convention's narrow exceptions to repatriation apply. Therefore, the Court will outline only those factual allegations pertinent to Petitioner's Hague Convention claim. Based on the pleadings and evidence presented at the hearing, the Court makes the following findings of fact.

Petitioner Roque Jacinto Fernandez, a Panamanian citizen, and Respondent Christy Nicole Bailey, an American citizen working in Panama, were involved in a romantic relationship. Respondent gave birth to the couple's twin sons, C.R.F.B. and R.J.F.B., on August 18, 2008. (Petitioner's Ex. 1, 2). The children are dual Panamanian and American citizens. Although Respondent and Petitioner never married, Petitioner's name is on the children's birth certificates. (Id.).

In May of 2009, Respondent left Panama with the children and moved to Missouri without Petitioner's consent. Subsequently, on May 13, 2010, Petitioner filed his first petition under the Hague Convention, seeking the return of the children to Panama. The District Court for the Eastern District of Missouri ordered that Respondent return the children to Panama in September of 2010. Fernandez v. Bailey, No. 1:10CV00084 SNLJ, 2010 WL 3522134, at *3

2

(E.D. Mo. Sept. 1, 2010), modified, No. 1:10CV00084 SNLJ, 2010 WL 5399220 (E.D. Mo. Dec. 23, 2010). As a result of a prior felony conviction he received while living in the United States as a juvenile, Petitioner was unable to obtain a visa and attend the 2010 hearing in person. Id. at *2; (Doc. # 18 at ¶ 11).

Following its hearing, the Missouri court found that Petitioner had a *ne exeat* right under Panamanian law, which qualified as a right of custody under the Hague Convention and entitled Petitioner to prevent the children's removal from Panama without his consent. Fernandez, 2010 WL 3522134, at *2. That court found that Respondent breached that right by removing the children to Missouri. Id.

At that time, Respondent argued that Petitioner had verbally and physically abused her and thus posed a grave risk of harm to the children should they be returned to Panama. Although the court found that there had been some verbal and physical abuse in the relationship between Petitioner and Respondent, the court determined that Petitioner had not abused the children and did not pose a grave risk of harm. Id. at *3. Therefore, the court ordered that Respondent return to Panama with the children to pursue custody proceedings there.

Pursuant to the Missouri court's order, Respondent returned to Panama with the children. In Panama, Petitioner initiated custody proceedings and criminal charges against Respondent for

the previous removal of the children. Pursuant to the ongoing custody proceedings, Petitioner had visitation rights to visit with the children every other weekend. Because of the contentious relationship between the parents, the Panamanian court designated a local children's police station as the drop-off and pick-up location for these visits.

During this time, Respondent filed restraining orders against Petitioner, after reporting to the police that Petitioner had attempted to strangle her, and tried to run over Respondent and the children with his car. (Respondent's Ex. 27, 28). However, Respondent conceded that the restraining orders did not require Petitioner to stay away from the children. Although he denied the allegations of abuse, Petitioner acknowledged that the restraining orders were in place.

In January of 2013, Petitioner violated the visitation order by refusing to return the children to Respondent following a weekend visit. Petitioner lived with the children and enrolled them in a Montessori School. The children remained in Petitioner's custody and attended that school until March 20, 2013.

On March 20, 2013, Respondent had the children removed from their school by the Panamanian police, who took the children to a courthouse where a judge ordered their children's return to Respondent.

Petitioner has not had any communication or visitations with the children following the Respondent's retrieval of the children on March 20, 2013. Petitioner testified that Respondent never brought the children to the designated children's police station for visitation. Furthermore, Petitioner testified that he accompanied the Panamanian police on three occasions to Respondent's apartment in Panama to determine if Respondent and the children were living there; but, the police were unable to enter Respondent's apartment and were told by building security on their third attempt that Respondent and the children had moved away. In contrast, Respondent testified that she brought the children to the designated drop-off location for visitation on six occasions, but Petitioner never came.

Pursuant to the criminal proceedings against Respondent, an exit restriction was put into effect in January of 2013, to prevent Respondent from leaving Panama with the children a second time. (Petitioner's Ex. 8). Yet, on February 2, 2014, Respondent and the children flew from Panama to Tampa, Florida. Petitioner submitted into evidence a letter to the Panamanian National Migration Service dated January 27, 2014, and signed with Petitioner's name. (Petitioner's Ex. 31). The letter, which Petitioner alleges is a forgery, states that Petitioner gives his consent for the children to leave Panama with Respondent on February 2, 2014. Respondent

denied knowledge of the letter and conceded that Petitioner never consented to the children's removal from Panama.

Upon their arrival in Florida, Respondent and the children initially lived in an apartment in St. Petersburg, Florida, but later moved to an apartment in Tampa that is located in a better school district. Respondent stated that she and the children have resided in the Tampa apartment since April of 2015, and presented copies of the lease agreement. (Respondent's Ex. 2). The children are enrolled in second grade at a local public elementary school and participate in extracurricular activities. Respondent is employed full-time and financially provides for the children.

Petitioner disputed the number of locations at which Respondent has lived with the children since coming to Florida in February of 2014. Petitioner claimed that Respondent first resided in Tallahassee, Florida, after arriving from Panama in February of 2014, before later moving to St. Petersburg, and Tampa. According to Petitioner, these moves were designed to conceal the children from him. Additionally, Petitioner alleged that Respondent used aliases and maintained two driver's licenses in different names, to further hide the children's whereabouts.

Respondent denied the use of aliases and testified that she has not lived in Tallahassee, Florida, since 2006. Respondent presented copies of leases for apartments in St. Petersburg and Tampa in her name. Respondent provided bills and her car

6

registration, all in her name. (Respondent's Ex. 2, 3). Additionally, the children were enrolled in school under their own names, and Respondent used her real name to register the children for extracurricular activities. (Respondent's Ex. 4, 5, 13).

Meanwhile, back in Panama, Petitioner was unaware that Respondent and the children had moved to Florida. Before learning that the children were in the United States, Petitioner tried to locate the children and press charges against Respondent in Panama. Unsatisfied with the progress made by his previous attorney, Petitioner hired a new attorney, Mr. Toribio Castillo, in September of 2014. Mr. Toribio Castillo petitioned a Panamanian court to provide Petitioner with immigration and other public records regarding the children. Subsequently, in late January of 2015, the Panamanian immigration authorities informed Petitioner that the children had left Panama nearly a year earlier on February 2, 2014.

Petitioner then filed a Hague Convention application at the United States Embassy in Panama in late February of 2015. The United States Department of State provided information regarding the location of the children to Petitioner, eventually disclosing the children's current location in Tampa, Florida. The Department of State also mailed letters to Respondent, notifying her of Petitioner's Hague Convention application, which Respondent denies receiving.

## II.  **Procedural History**

On August 24, 2016, Petitioner filed his Verified Petition for Return of Children to Panama (Doc. # 1), requesting that this Court order the return of the children to Panama following a hearing on the petition's merits. On the basis of the Verified Petition, the Court issued its Order Granting Temporary Restraining Order Under the Hague Convention on August 25, 2016. (Doc. # 2). That Order prohibited Respondent from removing the children from this Court's jurisdiction pending an evidentiary hearing on the merits of the Verified Complaint. In response, Respondent filed her amended Answer (Doc. # 15), denying many of Petitioner's allegations and invoking three exceptions to repatriation contained in the Hague Convention.

At the hearing, held between September 12, 2016, and September 14, 2016, Petitioner and Respondent were represented by counsel and both gave sworn testimony. Each side also presented additional witnesses. The Court allowed Petitioner and his Panamanian attorney, Mr. Toribio Castillo, to testify via contemporaneous video transmission. Furthermore, the Court held an *in camera* interview with the children, during which the Court asked the children about their lives in Florida and the possibility of returning to Panama, in order to determine the applicability of the various affirmative defenses raised by Respondent.

### III. **The Hague Convention and ICARA**

"The Hague Convention was enacted to 'secure the prompt return of children wrongfully removed to or retained in any Contracting State.'" <u>Ruiz v. Tenorio</u>, 392 F.3d 1247, 1250 (11th Cir. 2004). Under the terms of the Hague Convention, courts strive to decide the merits of return petitions within six weeks. Hague Convention, art. 11. "The convention is intended as a rapid remedy for the left-behind parent to return the status quo before the wrongful removal or retention." <u>Id.</u> "The Court's inquiry is limited to the merits of the abduction claim and not the merits of the underlying custody battle." <u>Id.</u> (citing 42 U.S.C. § 11601(b)(4)). Panama is a contracting state within the meaning of Article I of the Hague Convention. <u>Fernandez</u>, 2010 WL 3522134, at *1.

Recently, the Supreme Court has stated, "[w]hen a parent abducts a child and flees to another county, the Hague Convention on the Civil Aspects of International Child Abduction generally requires that country to return the child immediately if the other parent requests return within one year." <u>Lozano v. Montoya Alvarez</u>, 134 S. Ct. 1224, 1228 (2014). The children were removed from Panama on February 2, 2014. Because the Verified Petition was filed on August 24, 2016, the Petition is outside the one-year period. However, the expiration of the one-year period does not prevent the return of children under the Hague Convention. It merely

introduces the children's interest in settlement as a factor in the Court's decision. Id. at 1234.

**IV.  Prima Facie Case**

Petitioner bears the burden of establishing, by a preponderance of the evidence, that his children were "wrongfully removed or retained within the meaning of the Convention." Ruiz, 392 F.3d at 1251 (citing 42 U.S.C. § 11603(e)(1)(A)).  In order to prevail, Petitioner must prove that: (1) the children were "habitual residents" of Panama at the time Respondent wrongfully removed the children to the United States; (2) the removal was in breach of Petitioner's custody rights under Panamanian law; and (3) he had been exercising those rights at the time of removal. Ruiz, 392 F.3d at 1251. However, the establishment of a prima facie case by Petitioner does not conclude this Court's analysis. Rather, Respondent then may prove, as an affirmative defense, that one of the narrow exceptions to repatriation included in the Hague Convention applies. Lops v. Lops, 140 F. 3d 927, 936 (11th Cir. 2004). Respondent has argued that three different exceptions apply, which the Court will address after its analysis of the Petitioner's prima facie case.

Here, Petitioner and Respondent agree that the children were habitual residents of Panama at the time of their removal to Tampa, Florida, in February of 2014. Additionally, Respondent concedes that Petitioner had custody rights at the time of removal,

10

including visitation rights, allowing visitation every other weekend, as well as a *ne exeat* right under Panamanian law. Thus, the only disputed element of Petitioner's prima facie case is whether Petitioner was exercising his rights of custody at the time of the children's removal from Panama in February of 2014.

Although the removal of the children was in breach of Petitioner's custody rights under Panamanian law, Petitioner still must show that he was exercising those rights at the time of the removal or would have exercised those rights but for the removal. See Ruiz, 392 F.3d at 1251. A court is not bound to order the return of a child if the respondent demonstrates by a preponderance of the evidence that the person having care of the child was not exercising rights of custody at the time of the removal or retention of the child. Hague Convention, art. 13(a); 22 U.S.C. § 9003(e)(2)(B).

While the Hague Convention does not define the "exercise" of rights of custody, courts "liberally find exercise whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." Friedrich v. Friedrich, 78 F.3d 1060, 1065 (6th Cir. 1996). The Sixth Circuit has stated that "if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under

the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." Id. at 1066.

Under the Hague Convention, visitation rights are rights of access, rather than rights of custody. Tsai-Yi Yang v. Fu-Chiang Tsui, 499 F.3d 259, 275 (3d Cir. 2007). Rights of access "include the right to take a child for a limited period of time to a place other than the child's habitual residence." Hague Convention, art. 5(b). In contrast, Article 5(a) of the Convention specifies that rights of custody "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Rights of access, like visitation rights, receive less protection under the Convention than custody rights. "When custody rights are violated, a court can order that the child be returned to his or her habitual residence, while a court cannot order the return of a child when access rights are violated." Tsai-Yi Yang, 499 F.3d at 275.

Petitioner and Respondent focused much of their testimony on the lack of communication and missed visitations during the ten month period from March 20, 2013, to February 2, 2014, the date the children came to Florida. During this time, the children resided with Respondent in Panama but had no visitations or other contact with Petitioner. As discussed above, visitation rights are not rights of custody under the Hague Convention. However, the Court addresses Petitioner's exercise of these rights to the extent

12

that the exercise of visitation rights provides insight into whether Petitioner was also exercising or would have exercised his right of custody, the *ne exeat* right, at the time of the children's removal from Panama.

Petitioner testified that he attempted to exercise his visitation rights during the ten month period before the children moved to Florida. According to Petitioner, he went every weekend to the visitation drop-off location to wait for Respondent and the children, who never came. But Respondent testified that it was Petitioner who did not come to pick up the children for visitation. According to her, Respondent and the children waited at the drop-off location during the first six visitation weekends after the children were returned to Respondent on March 20, 2013.

Furthermore, a restraining order against Petitioner was in effect at this time. Petitioner testified that he did not call Respondent or approach her at her apartment, without the accompaniment of Panamanian authorities, because he feared Respondent would have him arrested. Respondent insisted that, in reality, the restraining order would not have led to Petitioner's arrest if he contacted her in an attempt to see the children. Indeed, Respondent asserted that Petitioner had violated previous restraining orders before March 20, 2013, without ever being arrested. However, Respondent admitted that calls from Petitioner

or Petitioner's unannounced appearance at Respondent's home, in theory, could result in his arrest.

Given the conflicting testimony, the Court does not find that the lack of visitation or other contact between Petitioner and the children between March 20, 2013, and February 2, 2014, support the conclusion that Petitioner had abandoned the exercise of all his parental rights, including his *ne exeat* right, at the time of the children's removal from Panama.

Rather, the Court finds that Petitioner was exercising his *ne exeat* right, or would have exercised that right but for Respondent's removal of the children from Panama. A *ne exeat* right is "the authority to consent before the other parent may take the child to another country." Abbott v. Abbott, 560 U.S. 1, 5 (2010). As the District Court for the Eastern District of Missouri found in 2010, Petitioner's *ne exeat* right under Panamanian law, "The Immigration Authorities, Title II, of Decree Law No. 3, Article 40," is a "right of custody" recognized under the Hague Convention. Fernandez, 2010 WL 3522134, at *2; see also Abbott, 560 U.S. at 15 (holding that a *ne exeat* right under Chilean law was a right of custody under the Hague Convention). Furthermore, that court found that Petitioner was exercising, or would have exercised, his *ne exeat* right to prevent Respondent from leaving Panama with the children at the time of the children's 2009 wrongful removal. Fernandez, 2010 WL 5399220, at *2.

The Supreme Court has explained the exercise of the *ne exeat* right as follows:

> [A] *ne exeat* right is by its nature inchoate and so has no operative force except when the other parent seeks to remove the child from the country. If that occurs, the parent can exercise the *ne exeat* right by declining consent to the exit or placing conditions to ensure the move will be in the child's best interests.

Abbott, 560 U.S. at 13. Thus, "[w]hen one parent removes the child without seeking the *ne exeat* holder's consent, it is an instance where the right would have been 'exercised but for the removal or retention.'" Id.

Furthermore, in this case, Petitioner had an exit restriction put in place with the Panamanian Immigration Authority to prevent Respondent from leaving Panama with the children. (Petitioner's Ex. 8). Therefore, the Court finds that Petitioner was exercising his right of custody at the time of the children's removal from Panama, or would have done so but for the wrongful removal.

**V.   Affirmative Defenses**

As mentioned previously, the Hague Convention includes a number of exceptions to the return of children to the country from which they were wrongfully removed. Respondent has argued that three exceptions apply: the grave risk of harm, mature objection, and well-settled exceptions. These exceptions are, in fact, affirmative defenses that must be established by the removing parent. 22 U.S.C. § 9003(e)(2). "As the Convention's official commentary has noted, narrow interpretations of the exceptions are

necessary to prevent them from swallowing the rule . . ." Gomez v. Fuenmayor, 812 F.3d 1005, 1011 (11th Cir. 2016).

Furthermore, "a court always retains discretion to order repatriation notwithstanding the applicability of any Hague Convention exception if that would best fulfill the purposes of the Convention." Haimdas v. Haimdas, 720 F. Supp. 2d 183, 204 (E.D.N.Y. 2010), aff'd, 401 F. App'x 567 (2d Cir. 2010).

### A. Grave Risk Of Harm

Under Article 13b of the Hague Convention, a court "is not bound to order the return of the child if . . . there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13b. This exception must be proved by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A). Additionally, "to invoke the defense, the party seeking to establish the exception must 'show that the risk to the child is grave, not merely serious.'" Gomez v. Fuenmayor, 812 F.3d 1005, 1012 (11th Cir. 2016)(citation omitted).

As the Sixth Circuit described, grave risks of harm typically fall within one of two categories:

> First, there is a grave risk of harm when return of the child puts the child in imminent danger *prior* to the resolution of the custody dispute—*e.g.,* returning the child to a zone of war, famine, or disease. Second, there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever

reason, may be incapable or unwilling to give the child adequate protection.

Friedrich, 78 F.3d at 1069.

The evaluation of an alleged grave risk of harm should focus on the risk faced by the child, not the parent. However, the Eleventh Circuit recognizes that "sufficiently serious threats and violence directed against a parent can nonetheless pose a grave risk of harm to a child as well." Gomez, 812 F.3d at 1010.

The Court finds that the children would not be at a grave risk of harm if returned to Panama. No doubt the relationship between Petitioner and Respondent is antagonistic. But Respondent has failed to show by clear and convincing evidence that Petitioner presents a grave risk to the children. The Court did not find Respondent's testimony regarding Petitioner's alleged physical abuse of the children and herself credible. Respondent alleged that Petitioner tried to run over Respondent and the children as she walked them into their nursery school. Furthermore, she testified that on a few occasions after picking up the children from their weekend visitation with Petitioner she noticed injuries to the children, including bruises on their arms, scratches to their stomachs, and belt marks on their backs. However, Respondent did not present medical or police documentation of the children's injuries.

To bolster her grave risk of harm defense, Respondent produced as a witness Ms. Gloria Mercedes Martinez-Jimenez, who worked as

the children's nanny in Panama and currently works for Respondent as the children's live-in nanny in Florida. Ms. Martinez-Jimenez's testimony supported Respondent's allegations of abuse, by noting the bruises she observed on the children after their visitations with Petitioner. However, given that Ms. Martinez-Jimenez's immigration status, home, and income are all dependent on Respondent, the Court did not find her claims regarding injuries to the children credible.

Therefore, Respondent has not established the grave risk of harm exception by clear and convincing evidence.

## B. **Mature Obejction**

Regarding the mature objection exception, the Convention provides: "The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [his] views." Hague Convention, art. 13. This exception must be proved by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B).

The Convention provides no specific age at which a child is deemed sufficiently mature and decisions applying this exception vary widely. Tsai-Yi Yang, 499 F.3d at 279. Courts disagree as to whether eight year old children are sufficiently mature.

Importantly, the mature objection of a child must address his or her particularized reasons for wishing to remain in their new

18

country, rather than the child's preference for the parent with whom he or she wishes to live. Haimdas, 720 F. Supp. 2d at 208 ("[child who was nearly ten years old] sees this as a choice of which parent he wants to live with, not which country he wants to grow up in; his stated preference to remain in New York is not a particularized, mature objection that should be part of the Court's Hague Convention analysis."); cf. Ago v. Odu, No. 8:09-cv-976-T-17TBM, 2009 WL 2169857, at *14 (M.D. Fla. Jul. 20, 2009)(applying mature child exception when "[a]s [the 14-year old child] sees it, life is better here and he is more comfortable in his surroundings. This is not a choice of parents but as he sees it a choice of country."). The length of a child's residence with the removing parent and the nature of the relationship between the parents are relevant to determining whether a child's objection is mature. See Haimdas, 720 F. Supp. 2d at 207 (discounting child's objection where "the child's view of his mother has clearly been impacted by his physical separation from her for much of his life and the strained and often bitter relationship between his parents"). In making its determination, a court should also consider whether a child's desire to remain or return to a place is "the product of undue influence," in which case the "child's wishes" should not be considered. De Silva v. Pitts, 481 F.3d 1279, 1286 (10th Cir. 2007).

Having interviewed the children *in camera*, the Court finds that the children have not stated a mature objection to returning to Panama. The children have resided solely with Respondent since arriving in Florida in February of 2014, a large portion of an eight year old child's life. Additionally, given the difficult relationship between Respondent and Petitioner, the Court does not consider the children's *in camera* statements regarding their desire to remain in the United States mature objections. Thus, this exception does not apply.

## C. **Well-Settled Exception**

Under the Article 12 well-settled exception, a court may decline to return a child who was wrongfully removed more than one year before if the respondent shows that the child is now settled in his or her new home. Hague Convention, art. 12. This exception must be proved by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B). Despite the fact-intensive inquiry involved, the well-settled exception is a narrow affirmative defense that should not focus on the merits of the underlying custody dispute. Thus, "[t]he Court is not to become mired in inquiries of who is the better parent or who occupies the nicer home. That is the role of the courts in the place of the child's habitual residence." Pacheco Mendoza v. Moreno Pascual, No. CV 615-40, 2016 WL 320951, at *1 (S.D. Ga. Jan. 26, 2016).

20

"Rather than establishing any certainty about the respective rights of the parties, the expiration of the 1-year period opens the door to consideration of a third party's interests, i.e., the child's interest in settlement." Lozano, 134 S. Ct. at 1234. Still, the Court remains free to consider whether the child's interest in remaining in the new country is outweighed by other interests of the child and the non-abducting parent, including "the child's interest in returning to his or her original country of residence . . . the child's need for contact with the non-abducting parent . . . the non-abducting parent's interest in exercising the custody to which he or she is legally entitled; the need to discourage inequitable conduct (such as concealment) by abducting parents; and the need to deter international abductions generally." Id. at 1237.

To fall under this exception, "the child must have significant connections demonstrating a secure, stable, and permanent life in his or her new environment." Alcala v. Hernandez, 826 F.3d 161, 170 (4th Cir. 2016)(affirming denial of return petition where child was doing well in school, had a network of relatives and friends, and was financially stable in South Carolina). A court should consider the totality of the circumstances regarding a child's welfare to determine if that child is well-settled. Id. The United States Department of State has concluded that "nothing less than substantial evidence of the child's significant connections to the

new country is intended to suffice to meet the respondent's burden of proof." State Dep't Legal Analysis § III (I)(1)(c), 51 Fed. Reg. at 10,509 (1986).

Being "well-settled" means "more than having a comfortable material existence." Lops, 140 F.3d at 946. A court looks at a number of relevant factors including the circumstances surrounding the children's living environment, the involvement of the abducting parent, the active measures taken to conceal the children's whereabouts, and the possibility of prosecution for conduct taken to take or conceal the children. Id. Furthermore, the Court will also look to the following factors:

> the age of the child; the stability of the child's residence in the new environment whether the child attends school or day care consistently; whether the child attends church or other religious institutions regularly; the stability of the [Respondent]'s employment; and whether the child has friends and relatives in the new area.

Lozano v. Alvarez, 697 F.3d 41, 57 (2d Cir. 2012), aff'd sub nom. Lozano v. Montoya Alvarez, 134 S. Ct. 1224 (2014)(affirming district court's finding that five year old child was settled in new environment and declining to order the child's return). These factors are non-exhaustive and a court may consider all types of evidence in making its determination. Alcala, 826 F.3d at 170 ("Given the lack of any textual limitation [in the Hague Convention], courts should consider any relevant circumstance that

demonstrates security, stability, or permanence — or the lack thereof — in a child's new environment.").

Generally, an older child has a greater interest in settlement in their new environment, because older children are "more likely to have memories of the United States and more ties to the country." Taveras v. Morales, 22 F. Supp. 3d 219, 236 (S.D.N.Y. 2014), aff'd sub nom. Taveras ex rel. L.A.H. v. Morales, 604 F. App'x 55 (2d Cir. 2015)(denying repatriation of an eight year old child who had been in the United States for over fifteen months); see also In re Robinson, 983 F. Supp. 1339, 1345 (D. Colo. 1997)(finding children settled where they were "old enough to allow meaningful connections to the new environment to evolve" and had built such connections).

Additionally, a child who has spent a long period of time in their new environment is more likely to be well-settled. "As time passes a child becomes increasingly settled or connected to its new environment and delayed return may itself become the second harmful disruption." In re Robinson, 983 F. Supp. at 1345. Here, the children are eight years old and have lived in the Tampa Bay area for a period of over two and a half years, beginning in February of 2014. This is a significant period of time in the life of a child, especially because the children are old enough to develop connections to their environment through their school, activities, and relatives.

Frequent moves between different residences or cities can prevent a child from becoming settled in a new environment, even if the child has lived away from his country of habitual residence for a long period of time. However, the fact that a child has resided in more than one residence during their stay in a new environment is not fatal to the well-settled defense. Where moving is infrequent and improves the child's quality of life and stability, courts have found that this factor does not weigh against finding a child well-settled. See Alcala, 826 F.3d at 172 (finding that respondent's two moves after arriving in South Carolina did not show instability because "each move appears to represent part of a natural progression to an improved living situation"). Also, changing homes within the same city or area may have a minimal impact on a child's daily life and sense of permanence. Id. at 167-68 ("Although the evidence established that she had lived with the children in three different homes in roughly fourteen months, each home was in the same general area in South Carolina and the moves did not disrupt the children's daily lives.").

During their time in Florida, the children resided in two locations, both in the Tampa Bay area. Respondent testified that they moved from St. Petersburg to Tampa in order to enroll the children in a better elementary school, because she had been unfamiliar with the area schools when she first enrolled the

24

children in February of 2014. Though in different cities, both residences are within the same general area - Respondent testified that it is a twenty minute drive between them.

Furthermore, the children have built relationships with Respondent's family members since their arrival in the United States. The majority of Respondent's relatives live in Alabama or Tallahassee, Florida. Respondent testified that the children have visited their relatives several times, and presented photographs from family gatherings. (Respondent's Ex. 20a). Additionally, Respondent's mother and stepfather are able to visit the children frequently in Florida. (Respondent's Ex. 20b). Although the distance between the children and these relatives prevents daily interaction, the Court finds that the children still have built a meaningful connection with their extended family while living in Florida.

Since enrolling in their current school in Tampa in April of 2015, the children have attended consistently and earned all satisfactory or excellent marks on their report cards. (Respondent's Ex. 4, 5). The elementary school has given the children awards for good behavior and citizenship, indicating that the boys are functioning well in school and amongst their peers. (Respondent's Ex. 6, 7, 11, 12). The children have made friends and participate in extracurricular activities. While living in St. Petersburg, they played in a local t-ball league. Later, at the

children's request, Respondent registered them to play on a club soccer team, for which they travel with their teammates and play competitively. (Respondent's Ex. 13). Last summer, Respondent enrolled the children in a Christian summer camp, where the children participated in adventurous activities like rock-climbing and archery. (Respondent's Ex. 15, 16).

In addition to the factors above, courts consider whether a removing parent has financial resources to maintain a stable home for the child because frequent job changes by the parent or moves resulting from limited job opportunities influence whether a child will develop a stable connection to their new environment. See De La Riva v. Soto, No. 2:15-cv-615-FTM-29MRM, 2016 WL 1696539, at *15 (M.D. Fla. Apr. 28, 2016)(finding child was not well-settled because the child's "financial security in the United States is unstable, and his stay here may come to an abrupt end, since Respondent is here illegally, without a work permit, and could be 'subject to deportation at anytime'"). However, the Court does not use the financial stability factor to compare whether the children have a more comfortable material existence in Florida than in Panama; rather, the Court looks to whether the children's needs are being met in their new environment. See Alcala, 826 F.3d at 167 (affirming district court's well-settled finding where the respondent was "clearly able to provide for the minor children"

and "the children were always provided adequate clothing, food, and shelter").

Here, Respondent is an American citizen working in a well-paying job, which Respondent testified partially motivated her move from Panama to Florida. She has been steadily employed since her arrival and has sufficient financial resources to keep a live-in nanny to help with child-care. The Court finds, and Petitioner does not dispute, that Respondent has a stable career and adequately provides for the children.

Finally, concealment is a factor that may be taken into account because concealment tactics, including frequent relocations, the use of aliases, and abstaining from school or community activities to avoid detection, may preclude a child from forming stable attachments. Lozano, 134 S. Ct. at 1236 (Alito, J., concurring). Thus, although analysis of the concealment factor examines the removing parent's behavior, the focus remains on the child's connections to their new environment.

The Court is not persuaded that Respondent used the concealment tactics alleged by Petitioner. Regardless, if they were used, the Court finds that these tactics have not prevented the children from forming a permanent and stable connection to their new environment. As discussed above, the children have attended the same school for over a year, are enrolled in school and extracurricular activities in their own names, and have lived

27

in only two homes in the Tampa Bay area since their arrival from Panama over two and a half years ago. While the Court is troubled by Respondent's removal of the children and suppression of the children's relationship with Petitioner, the children are thriving in Florida.

Furthermore, the Court believes that the children's interest in settlement in this case outweighs the other interests that would be served by returning the children to Panama. The Court is deeply disturbed by Respondent's actions. This is the second time Respondent has removed the children from Panama without Petitioner's consent. Because Petitioner had been unable to secure a visa to attend the 2010 Hague Convention hearing because of his prior conviction, Respondent likely knew that Petitioner could not travel to the United States to search for the children or participate in person if future custody proceedings were initiated here. As Petitioner correctly pointed out, preventing this type of forum-shopping by parents was a major motivation for the enactment of the Hague Convention.

Nevertheless, the interest in discouraging wrongful removals like that perpetrated by Respondent is not enforced at any cost under the Hague Convention. <u>Lozano</u>, 134 S. Ct. at 1235. As the Fourth Circuit has explained:

> If we were to hold that wrongful removal in itself should lead courts to exercise their retained discretion in the face of an established Convention exception, we would

> render that exception a nullity: a necessary predicate
> to considering whether a child is "settled" is a
> determination that the child was wrongfully removed; if
> the latter were sufficient to warrant ordering return,
> the settled determination would be meaningless.

Alcala, 826 F.3d at 175. Here, the Court finds that the children's interest in settlement outweighs the other interests of the Hague convention because disruption of the stable and permanent connection the children have established to their new home would be harmful.

The Court is sympathetic towards Petitioner and the difficulties he faced in locating the children; however, the fact that Petitioner may have had a good reason to file his petition over a year after the children's removal does not negate the harm that would come to the children if they were removed from their new environment. See Anderson v. Acree, 250 F. Supp. 2d 872, 875 (S.D. Ohio 2002)("This potential of harm to the child remains regardless of whether the petitioner has a good reason for failing to file the petition sooner, such as where the respondent has concealed the child's whereabouts."). Therefore, the Court denies the Verified Petition and declines to order the children's return to Panama.

However, the Court's Order is not a ruling on the underlying custody dispute. Rather, the Verified Petition's denial means that custody proceedings will occur in Florida, in order to minimize the disruption of the children's lives.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Petitioner Roque Jacinto Fernandez's Verified Petition

for Return of Children to Panama (Doc. # 1) is **DENIED.**

(2)   The Clerk is directed to **CLOSE** the case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>21st</u> day
of September, 2016.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE